## G. S. Arnold v. A. P. Anderson.

Decided January 31, 1906.

**1.—Election—Local Option—Ballots Not Signed by Judge.**

Section 72 of the General Election Law of 1903 (Acts 28th Leg., p. 147), requiring ballots to bear the signature of the presiding judge, is not in conflict with art. 6, sec. 2, of the Constitution prescribing the qualifications of voters, such regulation being a proper exercise of the power to make regulations to detect fraud and preserve the purity of the ballot box, authorized by Const., art. 6, sec. 4.

**2.—Same—Signing by Another.**

The purpose of the requirement of the signature of the presiding judge upon a ballot, to entitle it to be counted would be defeated by permitting it to be signed in his name by another, though with his authority, and ballots so signed are not entitled to be counted, the statute, in this particular, being mandatory, and applying to local option elections.

**3.—Contested Election—Effect of Rejection of Ballots.**

Where the rejection of ballots cast by lawful voters, by reason of failure of the election officers to comply with the law, altered the result of the election, the court, upon a contest thereof, properly declared the election void and ordered another.

Appeal from the District Court of Lampasas County. Tried below before Hon. John M. Furman.

*W. H. Browning* and *Walter Acker,* for appellant, upon their first assignment of error, cited: Const., art. 6, secs. 1, 2, 4; General Election Law, sec. 72, Acts 28th Leg., 147; Hanna v. State, 87 S. W. Rep., 703; Moyer v. Van Devanter, 29 L. R. A., 670; McCrary on Elec. (4th ed.), secs. 716, 717, 724; State v. Baker, 38 Wis., 71.

*Jenkins & McCartney,* for appellee, cited contra: State v. Conner, 86 Texas, 142; Orr v. Bailey, 80 N. W. Rep., 497; Slaymaker v. Phillips, 47 L. R. A., 853; Miller v. Schallern, 79 N. W. Rep., 866; Kirkpatrick v. Board Com., 44 S. E. Rep., 465; Whitnam v. Zahorick, 91 Iowa, 23; Taylor v. Bleakly, 55 Kan., 1; Powin v. Wimbery, 130 Ind., 561; State v. McElroy, 44 La. Ann., 796; De Walt v. Bartley, 146 Pa. St., 527; State v. Sax (Fla.), 32 Am. St. Rep., 57; Ransom v. Black, 54 N. J. L., 446; Mauck v. Brown, 81 N. W. Rep., 315; Kelso v. Wright, 81 N. W. Rep., 806; Kelly v. Adams, 55 N. E. Rep., 838; Cole v. Tucker, 29 L. R. A., 669; Rhodes v. Driver, 64 S. W. Rep., 273.

FISHER, CHIEF JUSTICE.—*Statement of the case.*—This is a contest over a local option election. An election was properly ordered in Lampasas County, and prohibition was defeated. The validity of the election was contested on several grounds, among which was that at the polls mentioned in the findings of the court illegal votes and ballots were cast, because many were not numbered, and were not endorsed with the signature of the presiding judge of the election, which votes were counted, and were considered in declaring the result of the election, and, if they had been excluded, the result would have been different.

The case was tried before the court without a jury, and judgment rendered holding the election illegal and void, and ordering another election to be held in the manner required by law. The trial court filed conclusions of fact and law, which are as follows:

"The court finds as facts established by the evidence:

"1.—That an election was held in Lampasas County, State of Texas, on June 30, 1905, in all of the voting precincts of said county, pursuant to an order of the Commissioners' Court of said county, made on June 12, 1905, for the purpose of determining whether or not the sale

of intoxicating liquors should be prohibited within the boundaries of said Lampasas County.

"2.—That said election was so held by the proper officers of election in all of said different precincts, and due returns thereof made.

"3.—That the Commissioners' Court of said county met at the courthouse in said county on July 11, 1905, in special session, and declared that there were cast at said election, 'For Prohibition,' 682, and 'Against Prohibition,' 696 votes, and that said election resulted in a majority of fourteen votes against 'Prohibition.' The total vote cast being 1,378.

"4.—I find that A. P. Anderson, contestant herein, was at the time of, and for a long time prior thereto had been, and now is, a resident of Lampasas County, State of Texas, and a legally qualified voter in said county and a taxpayer in said county.

"5.—I find that service of the contest herein was duly had on G. S. Arnold, contestee, and county attorney of Lampasas County.

"6.—I find that the election above referred to was held more than two years subsequent to the next preceding election on the same question.

"7.—I find that said Commissioners' Court, while in special session, did not open the boxes or count the votes cast, but estimated the votes, as above declared, from the face of the returns made by the officers holding said election at the various election precincts.

"8.—I find that at the voting precinct number 2, known as the 'Nix Box,' there were cast 104 votes, of which number 26 votes were 'for prohibition' and 78 were 'against prohibition,' none of which ballots were endorsed on the back with the name of the presiding judge. That on the day of said election at said 'Nix Box,' at said voting precinct number 2, when the voting was about to commence, the presiding judge handed out the first four or five tickets to the voters who presented themselves; that said tickets were not endorsed on the back by the presiding judge, and that said voters cast said ballots and same were deposited in the ballot box; that then the presiding judge at the election at said box discovered that the presiding judge had failed to sign his name on the back of said tickets, and he concluded that, as four or five ballots had already been voted without the signature of the presiding judge, that it was best to follow the course already pursued, and not to sign his name on any of the other ballots to be voted, which course was pursued thereafter during the entire day of the election, and that none of the ballots cast at said box at said election were signed on the back thereof by the said presiding officer.

"I find that all the ballots cast at said box were the same ballots delivered by the proper officers of said election to the voters as they presented themselves at the polls, and that all the ballots cast at said election at said voting precinct were cast by duly qualified voters. That the same were numbered before they were deposited in the box, as required by law, and that the poll lists kept by the proper officers at said voting precinct show the name of each voter, and his number, corresponding with the number of his ballot; and that said list was correctly kept, and that no voter at said box requested the presiding judge to en-

dorse his name on the ballot, and that no election officer at said box notified any voter of his right to do so, or of the necessity therefor.

"9.—I find that at said election of June 30, 1905, at voting precinct number 6, known as 'Gholson Box,' there were cast 51 votes, of which number 20 votes were cast 'for prohibition' and 31 were cast 'against prohibition.' That none of said ballots or votes were numbered before being deposited in the ballot box. I further find that after about one-half of the ballots were cast at said box the officers of election at said box discovered that the ballots had not been numbered, and, after consultation, they decided that it was best not to number any of the ballots to be cast at said election at said box thereafter, and that none of the ballots so cast were numbered.

"I further find that all the ballots so cast at said box were the ballots delivered by the officers of election to the respective voters, and that all the persons voting thereat were duly and legally qualified voters.

"10.—I find that the poll list kept by the proper officers of election at voting precinct number 1, known as Lampasas Box, show that 596 votes were cast at said box at said election, but that the returns, upon which the said county commissioners declared the result of said election, showed 598 votes to have been cast. Upon opening the box and counting and inspecting the ballots cast at said Lampasas Box, I find that, of all the votes cast at said box, 98 votes so cast were 'for prohibition,' and were unnumbered, and that 76 of said ballots were 'against prohibition,' and were unnumbered. That there were two ballots in said box which were neither numbered nor endorsed, and that one of same was 'for prohibition' and one was 'against prohibition.' That there was one ballot numbered on the face and not on the back thereof, and was 'for prohibition.' I further find that none of the first 174 ballots cast at the Lampasas Box No. 1 were numbered, the one hundred and seventy-fifth ballot was numbered 175, which was the number of said voter on the poll list, and that thereafter all tickets were numbered consecutively, as shown by the poll list. I find at said voting precinct number 1 the presiding judge wrote his name across the back of the first twenty-five tickets voted, after which he requested L. R. Sparks and William Joseph, officers of election at said box, to sign his name on the remainder of said tickets, for the reason that he did not have time to sign his name on said tickets as fast as the voters demanded tickets. To this arrangement all of the officers of the election agreed, and thereafter all the tickets voted, except two, which were not endorsed at all, had the signature of said presiding judge endorsed thereon by either said Sparks or said Joseph, and not by said presiding judge. That the tickets upon which the signature of said presiding judge were written by said Joseph were antiprohibition tickets, and the tickets upon which the name of said presiding judge were written by said Sparks were prohibition tickets. That said Joseph wrote the name of the presiding judge straight across the back of said tickets, and the said Sparks wrote the name of said presiding judge diagonally across said tickets. That the handwriting of said Sparks and of said Joseph were not at all like each other, and not like the handwriting of said presiding judge. I further find that it would have been impossible for the presiding judge to have signed his name across said tickets for

the first three hours after the polls were opened as fast as the voters presented themselves and demanded tickets. That, on account of the absence of a judge, the polls were not opened until eight o'clock a. m. at said box on said day of said election.

"11.—I find that, while the official returns upon which the Commis- sioners' Court estimated and declared the result of said election showed that 1,378 votes were cast, yet there was, in fact, only 1,376 votes cast, and, if the vote polled at Lampasas Box No. 1, to wit, 596 votes, and the vote polled at Nix Box No. 2, to wit, 104, and the vote polled at Gholson Box No. 6, to wit, 51, making a total at said three boxes of 751, were deducted from the total vote of 1,376, there would remain only 625 votes to be counted from all the remaining voting precincts, of which number 241 votes were 'against prohibition' and 384 were 'for prohibition,' and this would give a majority of 143 votes for pro- hibition.

"12.—I find that of the 751 votes cast at Box No. 1 (Lampasas), Box No. 2 (Nix), and Box No. 6 (Gholson), 454 votes were cast 'against prohibition' at these boxes, there being a majority against pro- hibition of 157 votes.

"13.—I find that, if the votes polled at these said three boxes are ex- cluded from the count of the votes polled at said election, that such ex- clusion would materially change the result.

"14.—I find that the first twenty-five ballots polled at Lampasas Box No. 1 were properly endorsed by the presiding judge, but were un- numbered. I find that the ballots between the twenty-fifth, up to and including the one hundred and seventy-fourth, were unnumbered, and not endorsed by the presiding judge, but by either L. R. Sparks or William Joseph writing the name of the presiding judge on the back thereof, with his consent and at his request. And I find that the re- mainder of the ballots cast at said box, commencing with the one hun- dred and seventy-fifth ballot, were numbered on the back thereof, but were likewise endorsed by said Sparks and Joseph writing the name of the presiding judge on the back thereof, which writing was done at his request.

"15.—I find that, with the exception of the failure to properly num- ber and endorse the ballots at said three boxes, as required by law, the said election was otherwise fairly, honestly and legally held, and that there was no intimidation, corruption or fraud practised by anyone.

"16.—I find that if the votes cast at the three said boxes be excluded in estimating the result of the said election, and said votes be not counted, then that a majority of the legal and duly qualified voters of Lampasas County, who desired and attempted to vote at election would be denied the right of having their votes counted and considered on the matter voted on at said election.

"17.—I find that said election was illegally conducted, and that, by the action, and want of action, on the part of the officers to whom was entrusted the control of same, in not properly endorsing and number- ing said ballots, such a number of legal voters were denied the privi- lege of voting as, had they been allowed to vote, would have materially changed the result.

*"Conclusions of Law.*—On the questions at issue in this case, I find the law to be: That, when the presiding judge at a voting precinct where an election is being held, and the other judges, are satisfied as to the right of a citizen to vote, they shall deliver to such citizen one of each of the official ballots, 'upon the blank side of each of which the presiding judge shall have previously written his signature,' and I find that this provision is both constitutional and mandatory. The law is further, that the ballot must be numbered before being deposited in the box, and an unnumbered ballot can not be counted in estimating the result of the election. The law is further, that the counting judges and clerks shall familiarize themselves with the signature of the presiding judge who writes his name on the ballots, and shall count no ballots that do not bear his signature or if on examination such signature is found to be a forgery, and I find that this provision is both constitutional and mandatory.

"The law further is that, on the hearing of a contest of an election, should it appear from the evidence that the election was illegally or fraudulently conducted; or that by the action, or want of action, on the part of the officers to whom was entrusted the control of such election, such a number of legal voters were denied the privilege of voting as had they been allowed to vote might have materially changed the result; or if it appears from the evidence that such irregularity existed as to render the true result of the election impossible to be arrived at, or very doubtful of ascertaining, the court shall adjudge such election to be void, and shall order another election to be held, and shall cause a certified copy of such judgment and order of the court to be delivered to such officer upon whom is devolved by law the duty of ordering such election.

"Hence, I conclude, as a matter of law, that the ballots cast at Lampasas Box, voting precinct number 1, and at Nix Box, voting precinct number 2, and at Gholson Box, voting precinct number 6, in not being numbered, or in not having the signature of the presiding judge endorsed on the blank side thereof, are illegal ballots, and can not be counted or considered in determining the result of said election. And I further conclude from the evidence that said election was illegally held, and that, by the action and want of action on the part of the officers to whom was entrusted the control of such election, such a number of legal voters were denied the privilege of voting as, had they been allowed to vote, would have materially changed the result.

"The court shall therefore declare, and does declare, said election void, and will enter the proper decree declaring the same to be void, and ordering another election, and requiring a certified copy of such judgment and order to be delivered to the officer upon whom is devolved by law the duty of ordering such election."

*Opinion.*—Appellant's objections to the judgment rendered are embraced in the following assignments of errors:

"1.—The court erred in its conclusions of law in holding that section 72 of the General Election Law, in force at the time the election involved in this case was held, is constitutional, which section provides:

'Counting judges and clerks shall familiarize themselves with the signature of the judge who writes his name on the ballots, and shall count no ballots that do not bear his signature, if, on examination by the judges, such signature is found to be a forgery,' and in not holding said section 72 contrary to and violative of section 2, article 6 of the Constitution of Texas.

"2.—The court erred in its conclusions of law in holding that the ballots cast at Lampasas Box, precinct number 1 (meaning all the ballots cast at that box), and the ballots cast at Nix Box, voting precinct number 2, and the ballots cast at Gholson Box, voting precinct number 6, were illegal ballots, and should not be counted or considered in determining the result of the election.

"3.—The court erred in its conclusions of law in this: That it should have considered and counted all the ballots cast at the Nix Box, voting precinct number 2, and should have considered and counted all the ballots cast at the Lampasas Box, voting precinct number 1, except those that were not numbered, and the result of said election should have been determined by the court in favor of contestee, for the reason that, excluding the unnumbered ballots at Lampasas Box and the Gholson Box, it appears from the court's findings of fact that a majority of twenty-five votes were cast against prohibition."

There is no dispute as to the facts, and there is no objection urged to any of the findings of the court upon that subject. In view of the findings of fact, if we should hold that section 72 of the General Election Law of 1903, which is assailed by the first assignment of error, is not obnoxious to the Constitution, and that that provision of the law is mandatory, and is applicable to elections of this character, then it becomes unnecessary to consider the other two assignments of error, because, if it is essential to the validity of a ballot that it shall bear the signature of the presiding judge, as required by this statute, then it is apparent from the findings that the votes excluded for this reason, and also for the reason that the ballots were not properly numbered, would give a majority in favor of prohibition. We do not understand from the brief of appellant that he raises any objection to the action of the court in excluding the votes that were not numbered; nor is it indicated in the brief that there is any express contention that the provision of the statute in question is not mandatory; nor is it expressly contended that the section in question, which is embraced in the General Election Law of 1903, which is known as the Terrell Election Statute, does not apply to local option elections, although such provision of the law may not be found in the statute providing for local option elections. But, although there is an absence of any express objection to the statute on these grounds, we will consider these several phases of the matter in determining the validity of the judgment of the court below.

Section 2, article 6, of the Constitution confers the right of suffrage upon all male persons possessing certain qualifications, and not subject to certain disqualifications. Section 4 of the same article provides that all elections shall be by ballot, and the Legislature shall provide for numbering the tickets, and make such other regulations as may be nec-

essary to detect and punish fraud and preserve the purity of the ballot box.

While that provision of the Constitution that prescribes the qualification of an elector may be self-enacting, and doubtless is, it must be construed in connection with the other provisions of the Constitution which follows it. It is a fact, apparent from the findings in this case, that those that polled the votes at the boxes examined were qualified electors, within the meaning of section 2, article 6. But the fact that the voter falls within the class of constitutional electors can not be taken to mean that his vote shall, without qualification, be counted, and that the Legislature has no power or authority to place any impediments in his way to casting the ballot and to surround the election with restrictions and conditions that have for their object and purpose of putting into effect, the spirit and intention of section 4. (Slaymaker v. Phillips, 47 L. R. A., 842 to 859, and reporter's notes.)

If we had no provision in our Constitution such as section 4, of article 6, there could be no question about the power of the Legislature to enact a law for the purpose of guarding the purity of the ballot box, and preventing fraud in casting and counting the vote and throwing restrictions around the manner and method of holding elections. But the article in question being direct upon this subject, and expressly granting the power to the Legislature to require all ballots to be numbered and to make regulations necessary to detect and punish fraud and to preserve the purity of the ballot box, it puts at rest any doubt upon this subject, and it is unnecessary for us to pursue the discussion of this branch of the question any farther.

It remains to be seen whether the statute in question is useful or serviceable in accomplishing any such purpose as indicated by the article of the Constitution named. The statute in question is section 72, page 147, Acts of the Legislature of 1903. It reads: "The counting judges and clerks shall familiarize themselves with the signature of the judge who writes his name on the ballots and shall count no ballots that do not bear his signature, or, if on examination by the judges, such signature is found to be a forgery."

Section 63 of the same law provides that the presiding judge shall write his signature on the ballot. Other provisions of the statute provide for the appointment of presiding judges, and for other judges and clerks, who constitute the official force required by law to hold the election; and the provisions of this Act very fully and minutely prescribe the duties of each of these officials.

The comparative lack of restrictions and requirements concerning polls, the form of the ballot, the manner and method of casting and holding elections, as prescribed in statutes of former years of this and most of the States, have given place to statutes of recent years, which, while not denying the constitutional right of suffrage, have guarded it with new and additional conditions and restrictions, in order to preserve the purity of the ballot box, and to prevent fraud and to insure an honest election and legal vote. And in order to accomplish these beneficial objects, many requirements are now exacted by present election laws which did not exist in the old laws upon this subject. The wisdom of these statutes can not be doubted, for the

theory that as civilization progresses beneficial conditions correspondingly improve, does not, in its relation to this subject, obtain; for the recent history of the country indicating frauds in elections, demonstrates that the more enlightenment possessed by the corrupt political boss, ward heeler and striker, the more resourceful and successful he is in perpetrating fraud and defeating an honest count in elections. And evidently, as a check upon skilled methods of this class, the Legislature wisely enacted section 72. One of the methods of fraud perpetrated, which may be ascertained from reading the history of elections in recent years in many of the States, was what is known as "stuffing" the ballot box,—adding spurious votes. To correct or to prevent this evil, it is difficult to imagine a means that could be better adopted than that provided for in section 72. The presiding judge is required to write his personal signature on the ballot. The counting judges and clerks are required to familiarize themselves with that signature, evidently for the purpose of enabling them to determine, if the occasion should arise, whether that was the signature of the judge or not; and if not, then it was evidently the purpose of the law that the ballot should not be counted. The signature of the judge was evidently intended as the distinguishing mark that gave validity to the ballot; and it was the evident purpose that if, upon inspection, ballots should be found wanting in the signature, that they should not be counted. The ballot box might be "stuffed" with spurious tickets which might, in the absence of this check, mislead and deceive; but if this law was complied with, it would be a difficult matter to perpetrate fraud, because out of the number of witnesses provided by law who must have a knowledge of the signature of the presiding judge, it would be easy to detect whether the signature was genuine or forged.

While upon this subject, it is well to notice the fact that the trial court found that the presiding judge did not sign the ballots, but under his authority they were signed by some of the officers engaged in holding the election. It would defeat the purpose and spirit of this Act to dispense with the personal signature of the presiding judge. The language used indicates clearly that he must, in person, sign his name, and that any ballot that does not bear his signature should not be counted. This duty being so imperative as demanded by the terms of the statute, in order that its purpose and effect might be accomplished, that is, making the personal signature of the presiding judge the final test of the verity and legality of the ballot, we do not believe that it was the intention of the law to permit him to delegate the authority to some one else to sign his name to the ballots. Rhodes v. Rider, 64 S. W. Rep., 273; Kirkpatrick v. Board of Canvassers, 44 S. E. Rep., 465.

Is the statute mandatory? There can only be one answer to this question. As said before, we do not understand that the appellant contends that such effect should not be given to the statute. It expressly says that the ballots that do not bear the name and signature of the presiding judge shall not be counted. Language could not be plainer, nor demand more imperative. It is an express restriction upon the rights and power and authority of the officers of election to count the ballot. The signature must exist, or there can be no

lawful ballot. The language employed in this statute is as strong if not stronger than that passed upon in the case of State v. Connor, 86 Texas, 136. Further citation of authority is deemed unnecessary upon this subject; but, as a matter of reference, we refer to 47 Law Rep. Ann., 804 to 859, where most of the case law upon this subject is collected by the reporter.

This being a local option election, do sections 63 and 72 of the general election law of 1903 apply? Article 3389, Sayles Civil Statutes of the local option law provides, that the officers holding said election shall, in all respects not herein specified, conform to the existing laws regulating elections; and after the polls are closed, shall proceed to count the votes and within ten days thereafter make due report of said election to the aforesaid court.

As to the manner of holding elections, as to the form of the ballot, as to the officers required to hold the elections, and what shall be done in casting the ballot, we find nothing in the local option statute that conflicts with section 63 and 72 of the election law of 1903. If the local option statute had contained any special provisions or requirements upon these subjects, then doubtless, under the doctrine announced in Ex parte Keith, 83 S. W. Rep., 683, and Hanna v. The State, 87 S. W. Rep., 702, they would have been exclusive, and we could not have looked to the general election law of 1903, in order to determine whether the election in question was properly held. But, as said before, there are no provisions of the local option statute that bear upon the questions that arise in this case. Therefore, the validity of the election must be determined by the general election law of 1903; and these provisions of the law being applicable, we must, in view of the findings of fact of the trial court, hold that he was correct in his conclusions of law.

Therefore, the judgment of the court below will be affirmed.

*Affirmed.*