## JOHNSTON v. PETERS. (No. 7066.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 23, 1924. On Motion for Rehearing, March 26, 1924.)

1. Elections ⊜181 — Struck ballot properly counted against candidate, though line drawn through ticket did not pass through his name, when opponent's name written in blank in another column.

Under Rev. St. art. 2969, permitting the voting of a straight ticket by running pencil or pen through all other tickets not intended to be voted, a ballot on which a straight line was drawn through the full length of the party ticket on which contestee's name was printed, though such line did not pass through contestee's name, which did not extend to the center of the column, was properly counted for contestant, where the latter's name was written in by the voter in the appropriate blank space in another column; thus conclusively indicating the voter's intent.

2. Elections ⊜181—Ballot as to which party column was not stricken and names of contestee or contestant scratched held not to be counted.

Ballots as to which the name of contestant had been written in at the appropriate place, but on which the printed name of contestee, who was a Republican nominee, had not been scratched, nor the Republican column stricken, as provided in Rev. Stats. art. 2969, could not be counted for either candidate, in view of article 3012.

3. Elections ⊜10—Purpose of law to give effect to intention of voter.

It is the purpose of the law to give effect to the intention of the voter.

⊜For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Elections ☞180(6)—Where only one man of particular name is candidate for particular office, ballots with name similar to surname of that candidate to be counted for him.**

Where only one man of a particular name is a candidate for an office, all ballots will be counted for that candidate when there is a clear relation between the appearance or sound of the surname written in and that of the candidate.

**5. Elections ☞180(6)—Candidate held entitled to votes, notwithstanding misspelling of name or omission of, or erroneous, initials.**

Where contestant was the only candidate for the office of sheriff who bore the name "Johnston," and he and Peters were the only candidates for that office, it would be presumed that where a voter wrote into the appropriate place on the ballot the name "Johnston," or any other name having a similar appearance or sound, that such voter voted for that candidate and not some one else, regardless of the misspelling of the name, or the omission of initials, or use of wrong ones.

**6. Elections ☞190—Ballots not fully marked or scratched for usual purposes of voting, and appearing to have been abandoned by voters, should not have been counted.**

Ballots certified as mutilated, which were not mutilated as implied from a normal use of that word, but which were not fully marked or scratched for the usual purposes of voting, and which appeared to have been abandoned as a ballot by the voters, should not be counted, especially in view of the presumption raised by the certificate of mutilation that they were not voted.

**7. Elections ☞176—Ballot without number not to be counted.**

In view of Rev. St. arts. 3005, 3012, a ballot which had no number should not have been counted.

**8. Elections ☞295(1)—Evidence of nonresidence held insufficient to overcome presumption of validity of vote.**

Evidence *held* insufficient to warrant the rejection of a ballot on the ground that the voter was not a resident of the precinct in which he voted, in view of the presumption in favor of the validity of the vote.

**9. Elections ☞305(6)—Defective ballots not discarded on appeal, where result would be unchanged.**

Where, if all the ballots which did not comply with the mandatory provisions of Rev. St. arts. 3001, 3005, 3011, 3012, in that they did not bear the signature of the judge and were not numbered, were discarded, the result would not be affected, the provision of article 3062, providing for deduction of such ballots from the totals of the candidate for which cast, and article 3063, directing another election if the voters, had they been allowed to vote, would have materially changed the result, are inapplicable to aid contestant on appeal.

**10. Elections ☞305(5)—Consideration of alleged missing votes could not be urged on appeal, in absence of conclusive showing they were missing.**

Where the record on appeal in an election contest did not conclusively show that a certain number of ballots of votes for contestant were actually missing, or that they or some of them were not included among those counted for him, as alleged, the appellate court could not consider the alleged missing ballots for the purpose of declaring the election void, under Rev. St. art. 3063.

**11. Elections ☞305(6)—Contestant held estopped from urging consideration of missing ballots, in view of stipulation approved by trial court.**

Where a stipulation between contestant and contestee, approved by the trial court, provided that certain ballots, being all the ballots "to be accounted for," show on their face, in connection with testimony introduced, to be as stipulated, a consideration of alleged "missing" ballots could not be urged on appeal to discredit agreed results, nor could the parties discredit that stipulation by showing that certain ballots bore duplicate numbers or were not properly assigned under the agreement, especially where the ballots to be accounted for under the stipulation were in fact accounted for, classified, and definitely assigned under the stipulation.

**12. Elections ☞295(1)—Policy of law to uphold declared results of election except on clear and convincing evidence of erroneous result.**

It is the policy of the law to uphold the declared results of elections in all cases, except where there is clear and convincing evidence of an erroneous result.

**13. Elections ☞298(3)—Not to be declared void except upon showing people deprived of privilege of expressing will at polls.**

An election should never be declared void and another one ordered, except in cases where it is shown that the people have been deprived of the privilege of expressing their will at the polls.

**14. Elections ☞298(1)—Duty of court of protecting public from, rather than thrusting upon it, expense and distractions of special elections.**

The interest of the public is paramount to the interest of individuals, and public policy imposes upon the courts the duty of protecting the public from, rather than of thrusting upon it, the expense, distractions, and strife of special elections.

Appeal from District Court, Nueces County; W. B. Hopkins, Judge.

Election contest between W. F. Johnston, contestant, and George Peters, contestee. From a judgment of the district court, affirming with certain modifications the judgment of the commissioners' court, contestant appeals, contestee assigning cross-error. Affirmed.

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Jefferson D. Todd and E. B. Ward, both of Corpus Christi, and Douglas, Carter & Childers, of San Antonio, for appellant.

W. F. Timon, of Corpus Christi, and Dougherty, Dougherty & Tarlton, of Beeville, for appellee.

SMITH, J. At the general election held on November 7, 1922, George Peters, the Republican nominee, was declared on the returns to be elected sheriff of Nueces county, over W. F. Johnston. The latter was a candidate as a Democrat, but, as he was not the formal nominee of the party, his name was not printed on the official ballot, as Peters' was. The consequence was that, in order to vote for Johnston, it was necessary for the voter to write Johnston's name upon the ballot at the time of voting. Peters' majority was declared, by the commissioners' court, to be 60. Johnston contested the election, and upon a trial judgment was rendered in favor of Peters, who was adjudged to have been elected by a majority of 45 votes.

At the conclusion of the trial the parties, at the instance of the court, entered into an agreement that "of 3,189 ballots to be accounted for, as hereinafter explained, the ballots show on their face, in connection with testimony introduced, to be as follows":

| | |
|---|---:|
| (a) For Peters | 1,445 |
| (b) For Johnston | 1,245 |
| (c) Ballots on which Johnston's name was written in and Republican ticket was struck, but the line thus drawn through that ticket missed Peters' name, designated as "Johnston—Republican struck—Peters missed" | 104 |
| (d) Ballots on which Johnston's name was written in but Peters' name was not scratched, designated as "Johnston—Peters not scratched" | 125 |
| (e) Ballots on which neither candidate was voted for, designated as "no votes" | 121 |
| (f) Ballots on which parties could not agree and which were submitted to the court as "questioned" ballots | 149 |
| Total | 3,189 |

However, the parties finally submitted to the court 152 questioned ballots, instead of 149. Of the 152 questioned ballots submitted to the court, all parties concede that the court correctly assigned 68 to Johnston, 3 to Peters, and 42 to be "no votes"; the court making no finding as to the remaining 2. This disposition left 39 ballots, as to which the court's findings are here attacked by Johnston. We have assigned these 39 votes as follows: 21 to Johnston, 7 to Peters, and 11 to "no votes." The entire group of 152 questioned ballots, then, will be assigned as follows: To Johnston 89, to Peters 10, to "no votes" 53; and thus the totals become—for Johnston, 1,438; for Peters, 1,455.

[1] As has been shown, 104 ballots (described in paragraph (c) above) were cast with Johnston's name written in its appropriate place, as a candidate for sheriff, and

260 S.W.—58

with the Republican ticket struck. The mark, however, although drawn down through the full length of the Republican ticket, did not pass through the name of Peters, printed thereon, but missed it, and to that extent the names of both candidates appeared upon the ballot unscratched. The names of the candidates on this ticket are not printed in the center of the ticket, but over to the left thereof, almost flush with the column rule, so that a line drawn down the center of the column misses and passes to the right of the names of some of the candidates. The name "Geo. Peters," as appellee's name appears on the ballot here, is much shorter than the average name on that ticket, so that a straight line drawn down the center of the ticket column, or so as to pass through the names of most of the other candidates, may still miss Peters' name, which occurred about halfway down the column. This was the condition of the 104 ballots now under consideration. In an appropriate cross-assignment of error, appellee, Peters, contends that these ballots should not have been counted for Johnston, but should have been discarded as no votes. We overrule this assignment and contention. It is provided in article 2969, R. S., that—

"When a voter desires to vote a ticket straight, he shall run a pencil or pen through all other tickets on the official ballot, making a distinct marked line through such ticket not intended to be voted. * * *"

Upon the ballots under consideration the voters "marked a straight line through" the full length of the ticket on which Peters' name was printed, and thus plainly indicated their intention to vote against the entire ticket, notwithstanding the straight line did not pass directly through Peters' name, which did not extend to the center of the column in which the ticket was printed, as most of the other names thereon did. The purpose to vote against Peters was thus plainly indicated, however, and was conclusively shown when the voter wrote the name of Peters' opponent in the appropriate place in another column left blank for that purpose. The intention of the voter being clearly shown, and there being no statutory provision rendering the ballot void, it was properly counted as cast.

[2] There was another class of ballots, 125 in number, and described in paragraph (d) above, on which the name of Johnston had been written in at the appropriate place, but on which the printed name of Peters had not been scratched, or the Republican column struck, as in the case of the 104 ballots. The court decided these 125 ballots to be "no votes," and counted them for neither candidate. In this the court followed the plain mandate of the statute, and must be upheld. It is provided in article 3012, that—

"Where the names of two or more persons are upon a ballot for the same office, when but one person is to be elected to that office, such ballot shall not be counted for either of such persons."

This provision is held to be mandatory, has been applied to cases such as this, and it has been held that such ballots cannot be counted. Wright v. Marquis (Tex. Civ. App.) 255 S. W. 637, and authorities there cited. Appellant's assignments complaining of the action of the court in refusing to count these ballots will be overruled.

[3-5] Some voters had difficulty in correctly writing Johnston's name in the ballot, whereby it often occurred that his initials were either omitted entirely, transposed, or otherwise incorrectly given, or the name "Johnston" misspelled. The trial court, however, counted all such ballots for Johnston, except where the "first or distinctive initial" was incorrectly given. Of this excluded class there were 17 ballots, and we are called upon to decide if those should also have been counted for Johnston. It is the purpose of the law to give effect to the intention of the voter, where that intention is clearly determined; and the rule now is that, where only one man of a particular name is a candidate for an office, all ballots will be counted for that candidate when there is a clear relation between the appearance or sound of the surname written in and that of the candidate. McCrary, Elec. § 528 et seq.; 20 C. J. § 190, p. 160. Appellant was the only candidate for the office of sheriff who bore the name "Johnston," or any similar name, and he and Peters were the only candidates for that office. And where the voter wrote into the appropriate place on the ballot the name "Johnston," or any other name having a similar appearance or sound, the presumption is that the voter was voting for the candidate and not some one else, notwithstanding the name was misspelled or wrong initials were given. In pursuance of this conclusion, we have assigned to Johnston 17 votes, which were counted by the court below as "no votes," and these are included in the calculations hereinabove given. The court's findings upon these ballots were among the 39 attacked here by appellant, and previously referred to herein.

[6] Ballots 136, precinct 6, 30 and 157, precinct 15, and 118 and 261, precinct 4, were returned by the election officers as "mutilated." The trial court, however, found that these ballots were not in fact mutilated and counted them as votes for Peters according to their purport. In this we think the court erred. It is true that these ballots were not "mutilated," as implied from a normal use of that word, but they were not fully marked or scratched for the usual purposes of voting, and appear to have been abandoned as a ballot by the voters. Besides, the certificate of mutilation surely raises the presumption that they were not voted, and they should not have been counted. These ballots are included in the group of 39 questioned ballots heretofore disposed of in this opinion.

[7] Included also in said group of 39, ballots 73 in precinct 1, 138 in precinct 2, 42 and 235 in precinct 4, 90 in precinct 5, 75 in precinct 6, and 232 in precinct 14, were counted for Peters by the court below, and appellant challenges this disposition of those votes, contending that some of them were in fact for Johnston, and the others no votes. In each of these cases, however, the court's finding was one of a disputed issue of fact, as were also the findings as to ballots 235, precinct 13, 48 in precinct 14, and 61 in precinct 15, which were held to be no votes, but are here claimed for Johnston. We have not disturbed these findings. In the same group of 39 ballots the trial court found that ballots 323 in precinct 6, and 46 in precinct 4, were Peters' ballots, as they clearly showed to be upon their face. These ballots were not among those submitted to the court or in any manner questioned, however, and obviously had already been counted as cast. Accordingly, they have been deducted from those assigned to Peters out of the group of 39 questioned ballots. In the same group, ballots 53 and 322, precinct 6, and 391, precinct 13, were submitted and findings requested thereon by appellant, but, apparently through inadvertence, the court made no finding on either ballot. Both ballots were clearly cast for Johnston, and have been assigned to him. Among the ballots in precinct 4 was one which had no number, and which is among the group of 39 which Johnston claims should have been counted for him. Under the provisions of articles 3005 and 3012, ballots having no number shall not be counted, and this ballot will accordingly be counted as no vote, as held below.

[8] Ballot 13, in precinct 6 was cast by a voter whom the court found not to be a resident of the precinct in which he voted. According to the testimony as stated by appellant, which is not challenged by appellee, and, so far as we have been able to ascertain by an independent examination of the record, the evidence was not sufficient to overcome the presumption in favor of the validity of this vote, or show that the voter was not entitled to vote in that precinct. This ballot will be counted for Johnston, for whom it shows to have been voted. It was included in the group of 39 questioned ballots, each of which has now been disposed of in detail, whereby, as stated, the total votes of the candidates become, for Peters, 1,455; for Johnston, 1,438; Peters' majority, 17.

[9] The record shows that 516 ballots, which are included in the totals credited to

the two candidates, were defective in either of the following particulars: (1) They did not bear the individual signature of the presiding judge of the election, as provided for in articles 3001, 3005, and 3011; or (2) they were not numbered as provided in articles 3005, 3011, and 3012. Of this number 32 ballots were no votes, and of the remainder 334 were shown to have been cast for Johnston and 150 for Peters.

It is provided, in articles 3001 and 3005, that the presiding judge shall write his signature on the ballots before they are issued to the voters to be by them voted, and in article 3011 it is further provided (italics ours):

"The counting judges and clerks shall familiarize themselves with the signature of the judge who writes his name on each ballot that is voted, and *shall count no ballots that do not bear his signature or are unnumbered*, or if, on examination by the judges, such signature is found to be a forgery."

It is also provided in article 3005 that one of the judges of the election shall "number the ballot" when it has been voted; and in article 3012 it is provided, that "no ballot which is *not numbered* as provided in article 3005 shall be counted. * * * "

It has been held that these two provisions of the statute, requiring that the ballots bear the signature of the judge and shall be numbered, are mandatory, and that ballots which do not bear such number and signature shall not be counted. McCrary, Elec. §§ 226, 227; State v. Connor, 86 Tex. 133, 23 S. W. 1103; Gray v. State, 92 Tex. 396, 49 S. W. 217; Arnold v. Anderson, 41 Tex. Civ. App. 508, 93 S. W. 692; Ex parte Anderson (Tex. Cr. App.) 102 S. W. 727; Griffin v. Tucker, 51 Tex. Civ. App. 522, 119 S. W. 338; Shipman v. Jones (Tex. Civ. App.) 199 S. W. 329.

But to discard these 516 ballots does not affect the disposition of this appeal, under the provisions of article 3062, because, when deducted from the totals of the candidates for whom respectively cast, as provided in said article, Peters' majority would be thereby increased to 201; whereas they are likewise ineffectual under article 3063, which provides that, where a sufficient number of voters are by the election officers deprived of the privilege of voting as, had such voters "been allowed to vote, would have materially changed the result, the court shall adjudge the election void, and direct the proper officers to order another election. * .* *"

[10, 11] Appellant contends that the ballots of 21 Johnston voters were missing when the case was tried, and were not and could not be accounted for, and further contends that, even though such ballots cannot be counted for Johnston (as they assuredly cannot be), yet, nevertheless, they should be considered for the purpose of declaring the election void,

under the provisions of article 3063. We have very carefully considered the several questions evolved out of this contention, which must be overruled. In the first place, the record does not show, conclusively, at least, that such number of ballots were actually missing, or that they, or some of them, were not included among those counted for Johnston. And again we are of the opinion that to consider this contention would be to go behind the agreement of the parties,' in which it was stipulated, in effect, that there were only 3,189 ballots to be accounted for, and which were in fact accounted for, classified, and definitely assigned in said agreement. Appellee insists that all .ballots were included in this agreement, and the language of the agreement seems to so stipulate, both in terms and by clear implication. For the same reason, we think appellant is clearly estopped from now complaining of the alleged duplication of 33 ballots, comprising as many pairs of ballots bearing duplicate numbers. It was the very purpose of the agreement to limit the questions to be submitted to the trial court to the 149 "questioned" ballots, which number was reduced to 39 on this appeal. We feel obliged to respect and enforce this agreement. Of course, this court would not enforce any agreement whereby the individual candidates sought to destroy the effect of lawful ballots, or give effect to illegal or void ballots. But here we are confronted with an agreement between the parties, and approved by the trial court, that certain ballots, being all the ballots "to be accounted for," show, on their face, in connection with testimony introduced, to be as stipulated. If the agreement included "all ballots to be accounted for," and even more than were counted or returned by election officers of commissioners' court, then certainly alleged "missing" ballots may not now be marshaled here for the purpose of discrediting the agreed results. And if, as stipulated in the agreement, the ballots to be accounted for "show on their face, in connection with testimony introduced," to be as further stipulated in the agreement, the parties may not now discredit that agreement by showing that certain ballots bore duplicate numbers, or were not properly assigned under the agreement.

[12-14] The commissioners' court found, after a canvas of the votes, that Peters had been elected by a majority of 60 votes, and in the recount in the district court it was again found that Peters had been so elected; this time his majority being placed at 45 votes. While our findings and conclusions have resulted in a reduction of Peters' majority, they do not change the result declared by the commissioners' court, the tribunal designated by law to ascertain such result, and confirmed by the trial court in a long and painstaking recount. It is, and

ought to be, the policy of the law to uphold the declared results of elections in all cases, except where there is clear and convincing evidence of an erroneous result. In this case, even if every substantial contention made here by appellant, the contestant, were sustained, we could do no more nor less than hold the election void and order another, and this should never be done, except in cases where it is shown that the people have been deprived of the privilege of expressing their will at the polls. The interest of the public is paramount to the interest of individuals, and public policy imposes upon the courts the duty of protecting the public from rather than of thrusting upon it the expense, distractions, and strife of special elections. This is rendered particularly true in situations in which much bitterness already permeates the constituency concerned.

We deem it our duty, upon the face of the record, to uphold the result, apparently regularly ascertained through the machinery provided by law for the purpose, and confirmed by the district court, whose judgment is now affirmed.

### On Motion for Rehearing.

Pending action upon appellant's motion for rehearing, this court, upon its own motion, set aside the judgment of affirmance, as well as the submission of the cause, ordered the case resubmitted, and requested counsel to submit additional argument, which they have done with much ability and consideration. We have concluded, however, after careful reconsideration, and with some hesitancy, to confirm the original disposition of the cause. Therefore the order setting aside the judgment of affirmance will itself be set aside, and the judgment affirmed, in accordance with the original opinion on file.